## McDONNELL DOUGLAS CORPORATION, Plaintiff,

v.

## NATIONAL AERONAUTICS & SPACE ADMINISTRATION, Defendant.

### Civ. A. No. 94–2452 (RCL).

United States District Court, District of Columbia.

June 30, 1995.

See also 895 F.Supp. 316.

Peter J. Wellington, Jerald S. Howe, Henry E. Hockeimer, Jr., Steptoe & Johnson, Washington, DC, for plaintiff.

Eric H. Holder, Jr., United States Attorney, John Oliver Birch, Cynthia A. Schnedar, Assistant United States Attorneys, Washington, DC, for defendant.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on cross-motions for summary judgment, and plaintiff's motion for leave to file a supplement to the administrative record.

Summary judgment is appropriate when there is "no genuine issue as to any material

fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no dispute as to the material facts in this case. Upon consideration of the pleadings and the administrative record, the court will therefore grant defendant's motion for summary judgment concerning disclosure of the disputed information. Plaintiff's cross-motion for summary judgment will be denied, and plaintiff's motion for leave to file a supplement to the administrative record will be granted to the extent set forth herein.

## I. Background

In November of 1990, the National Aeronautics & Space Administration ("NASA") contracted with McDonnell Douglas Aerospace ("MDA") for the purchase of Delta II rockets and related launch services. In 1991 NASA received a Freedom of Information Act ("FOIA") request for information concerning the Delta II contract, and decided to release, among other things, certain contract line item prices ("CLINs").

 MDA filed suit under the Administrative Procedure Act (APA), claiming that NASA's decision to release the CLINs was arbitrary and capricious.[1] MDA claimed that the disputed CLINs were protected by exemption four of FOIA, which excludes from disclosure "trade secrets and commercial or financial information obtained from a person [which are] privileged or confidential."[2] 5 U.S.C. § 552(b)(4). This court found the CLINs to be confidential under exemption four of FOIA and issued an injunction prohibiting NASA from releasing the "contract line item prices [CLINs] con-

tained in Section B.2" of the contract. *McDonnell Douglas Corporation v. National Aeronautics and Space Administration,* No. 91–3134, 1992 WL 725355 (D.D.C. Jan. 24, 1992) ("*McDonnell I*").

██ In this case, McDonnell Douglas seeks once again to prevent information concerning the Delta II contract from being released pursuant to a FOIA request. After receiving another FOIA request for the Delta II contract in 1994, NASA determined that certain termination schedule percentages and secondary payload prices in the Delta II contract were releasable under FOIA.[3] NASA also reviewed the releasability of the CLINs that were enjoined from disclosure in *McDonnell I.* The agency determined that the CLINs were no longer confidential, and that if the court modified the existing injunction the CLINs would be released. MDA once again filed suit under the APA claiming that NASA's decision to release the information at issue was arbitrary and capricious, and that the information was covered by exemption four of FOIA, 5 U.S.C. § 552(b)(4).[4]

## II. Analysis

### A. Information at Issue

The first issue before the court is exactly what information from the Delta II contract is in dispute. NASA argues that there are three categories of pricing information at issue: (1) termination schedule percentages, (2) secondary payloads, and (3) the same CLINs which were at issue in *McDonnell I.* MDA counters that only termination schedule percentages and secondary payload pric-

---

1. Agency decisions to release information pursuant to FOIA requests are considered informal agency adjudications, subject to the APA's "arbitrary and capricious" standard of review, 5 U.S.C. § 706(2)(A). *Chrysler Corp. v. Brown,* 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979).

2. McDonnell Douglas also claimed that release of the CLINs was forbidden under the Trade Secrets Act, 18 U.S.C. § 1905. The D.C.Circuit recognizes the scope of the Trade Secrets Act to be co-extensive with exemption four of FOIA. *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1151 (D.C.Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988).

3. Termination schedule percentages specify the percentages of total launch prices MDA refunds if NASA cancels a mission, with the percentage decreasing as the launch date nears. A secondary payload is a small satellite that may be launched on the same vehicle as a larger satellite already scheduled for launch.

4. As in *McDonnell I,* this claim is also brought under the Trade Secrets Act, 18 U.S.C. § 1905. As noted above, the D.C.Circuit recognizes the scope of exemption four of FOIA and the Trade Secrets Act to be co-extensive. It is therefore unnecessary to perform a redundant analysis under the latter Act.

ing information are in dispute. According to MDA, the injunction issued by this court in *McDonnell I* prohibits NASA from adjudicating at the agency level whether the CLINs can be released.

In deciding whether to release the CLIN information pursuant to the latest FOIA request, NASA exceeded its authority by conducting an informal agency adjudication regarding release of information already enjoined from disclosure. When a FOIA request is received for information previously enjoined from disclosure, the agency does not have the authority to adjudicate whether the information should be released. In such a case there is "simply ... no discretion for the agency to exercise." *GTE Sylvania Inc. v. Consumers Union,* 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980). It is an "established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed." *Id.*

■ In reviewing the releasability of the CLINs, NASA imposed on MDA the burden to justify why information already subject to a permanent injunction should continue to be exempt from disclosure. NASA simply does not have the authority to require MDA to justify again and again why information, the disclosure of which has been enjoined by a federal court, should continue to be enjoined. If NASA desires to have the existing injunction modified or dissolved it has the burden to make the appropriate showing in court, not within its own agency.

NASA submits that when information previously exempted from disclosure is sought in subsequent FOIA requests, changed circumstances necessitate a re-examination of the applicability of the exemption. If this case involved a previous agency decision to withhold information or an injunction that was limited to a single FOIA request, NASA's argument would have some merit. But when a permanent injunction against release of specific information already exists, the agency simply lacks the discretion to decide whether the information should be released. The court therefore concludes that only two categories of pricing information are at issue

in this dispute: (1) termination schedule percentages, and (2) secondary payloads.

### B. Administrative Record

The second issue the court must decide is what properly constitutes the administrative record in this case. MDA claims that the certified administrative record is incomplete, and seeks to add nine letters which it argues will give this court a more accurate basis upon which to review NASA's decisions. Eight of the letters in question represent previous NASA decisions not to release termination schedule percentages in the Delta II contract pursuant to other FOIA requests. The last document is a letter from MDA to NASA returning an enclosure previously sent by NASA.

Plaintiff stresses that the proposed supplements to the record were all in the agency's possession during the administrative process, and that five of the letters were specifically referenced in one of MDA's submissions to NASA. MDA's goal is to illustrate that NASA departed from prior decisions without adequately explaining the inconsistent determination. Plaintiff contends that the court will be severely handicapped in addressing this issue if NASA's prior decisions regarding the Delta II contract are not in the record.

NASA characterizes MDA's motion to supplement the record as an improper attempt to reopen the administrative process for submission of evidence following the agency's decision. The agency argues that its responses to prior FOIA requests, some from years earlier and most from different requesters, carry no precedential value because of the agency's duty to consider each individual request separately. Defendant also claims that contract modifications containing the information at issue were not executed until after the earlier FOIA requests, and that the information in the present request is therefore different from the information sought in prior requests.

■ After closely scrutinizing the administrative record, the court finds that five of the nine proposed supplements were improperly omitted from the administrative

record, and will therefore be permitted as supplements.[5] Although NASA did not examine these additional documents, they were specifically referenced in an MDA letter to NASA. The letter referencing the documents at issue was submitted late in the administrative period, but still considered by NASA and included in the certified record.[6] Once NASA enters a document into the record, it cannot pick and choose what information in the document will be considered. 14 C.F.R. § 1206.101(a).

■ The letter from MDA returning an enclosure, however, was received by NASA after the administrative process closed. Also, three of the eight letters representing previous NASA decisions were not referenced or submitted by either party. These four documents are therefore appropriately not part of the record.

■ Even with the supplemented record, however, MDA's argument that NASA improperly failed to explain inconsistent decisions does not succeed. First, NASA regulations require only a brief explanation whenever the agency decides to release information over the objections of a submitter. 14 C.F.R. § 1206.610(e) (1994). NASA more than met the requirement to give a brief explanation for its decision in its Notice of Intent to Release, dated October 27, 1994. Administrative Record ("AR") at 24. NASA also adequately addressed the late arguments submitted by MDA in a final letter dated Nov. 15, 1994. AR at 30.

Second, NASA's policy, which was made abundantly clear to MDA throughout the administrative period, is to process FOIA requests individually. Due to a multitude of variables involved in FOIA requests, such as different requesters and the effect of time on the decision to disclose or release information, NASA performs individual inquiries for each request. Even when NASA decides to release information that it previously exempted from disclosure, the agency is only required to give a "brief explanation" that is

rationally based upon the record. 14 C.F.R. § 1206.610(e).

Third, the case law cited by MDA does not support its argument that NASA was arbitrary for failing to explain inconsistent decisions. MDA quotes *Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994) for the proposition that "[i]f an administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable." MDA also cites *Baltimore & Annapolis R.R. v. WMATC*, 642 F.2d 1365, 1370 (D.C.Cir. 1980) holding that "it is vital that an agency justify a departure from its prior determinations." These cases, however, are inapposite.

In *Baltimore & Annapolis R.R.*, the Washington Metropolitan Area Transit Authority ("WMATA") abandoned an established agency precedent without any explanation. *Baltimore & Annapolis R.R.*, 642 F.2d at 1371. The D.C.Circuit held that WMATA could not overrule a decision that had been in effect for over twelve years without stating a reason. *Id.* The present case is different in that NASA is not overturning a rule or policy. Indeed, it is NASA's policy that all FOIA requests are to be treated individually because of the number of variables that make each request unique. Additionally, unlike *Baltimore & Annapolis R.R.*, where WMATA gave no reason for its decision, NASA complied with its regulations and gave a brief explanation for its decision.

In *Davila–Bardales v. INS* the Immigration and Naturalization Service ("INS") contradicted its previous interpretation of a border interview regulation. The result was conflicting interpretations of the same regulation in almost identical factual situations. *Davila–Bardales*, 27 F.3d at 5. Unlike INS's conflicting interpretations in *Davila–Bardales*, NASA was consistent in interpreting its requirements of an individual inquiry for each FOIA request and a brief explanation for its determination regarding disclo-

---

5. The five supplemental documents are: NASA letter to Elizabeth Winkelman (Feb. 11, 1991); NASA letter to S.J. Olson (Feb. 11, 1991); NASA letter to J.A. Rangus (Feb. 11, 1991); NASA letter to McDonnell Douglas (Aug. 13, 1992);

NASA letter to McDonnell Douglas (Sept. 14, 1992).

6. McDonnell Douglas letter to NASA (Nov. 10, 1994).

sure. Thus, the cases cited by MDA do not support its argument that NASA failed to adequately explain an inconsistent decision.

### C. Disclosure

■ The court must next review NASA's decision to disclose the termination schedule percentages and secondary payload prices to see if that determination was rationally based on the record. In "reverse-FOIA" cases such as this, where an agency wants to release information but the submitter of that information objects, the court may set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1977); *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 337 (D.C.Cir.1989). Under this deferential standard of review, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

To uphold NASA's determination to release the information at issue the court must review two NASA decisions. These decisions are first, that MDA's submission of the contract information in question was not voluntary, and second, that the information at issue was not confidential.

■ This circuit applies different legal standards to FOIA exemption four cases, depending on whether the information being sought was provided to the government voluntarily or under compulsion. *Critical Mass Energy Project v. NRC,* 975 F.2d 871 (D.C.Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). If the information being sought was provided *voluntarily* to the government, then *Critical Mass* provides the appropriate legal standard for determining confidentiality under FOIA exemption four.[7] If, on the other hand, the government *required* the information, then *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974), establishes the test for confidentiality under

FOIA exemption four. In this case, NASA determined that the information at issue was required by the government and was therefore not voluntarily submitted.

■ Upon review of the administrative record, the court finds NASA's determination on the issue of voluntariness to be sustainable. NASA's Request For Proposal ("RFP") (the government's solicitation for offers for the contract at issue) used language of compulsion in reference to pricing information. For example, the RFP used the words "shall", "must", and "mandatory" when referring to pricing data. Furthermore, one proposer who failed to provide required pricing data was eliminated from the competition, supporting NASA's contention that pricing data was indeed mandatory.

MDA points out that some of NASA's responses to pre-proposal questions stated that "offerors may take exception to any contract terms and conditions in accordance with Section L–4D of the RFP." The plaintiff views this as evidence of the voluntary nature of the information in question. But Section L–4D itself is replete with mandatory language, including a specific requirement to furnish termination schedule percentages.

MDA also argues that resolution of the voluntariness issue requires nothing more than reference to the "ancient concepts of freedom of contract." The argument is temptingly simple: Since McDonnell Douglas did not have to enter into a contract, no information within the contract can be considered mandatory. However, this rather simplistic approach to FOIA exemption four analysis would result in classifying all government contractors as per se volunteers whose pricing information could easily be withheld from the public domain. Such a result would conflict with FOIA's primary purpose of promoting public access to information in the government's possession. 5 U.S.C. § 552(a).

Additionally, case law from this court supports NASA's conclusion that pricing information required for a government contract is

---

7. *Critical Mass* holds that financial or commercial information provided to the government on a voluntary basis is confidential if it is of a kind

that would customarily not be released to the public by the person from whom it was obtained. *Critical Mass,* 975 F.2d at 879.

mandatory under a FOIA exemption four analysis. In *Lykes Bros. Steamship Co., Inc. v. Pena,* No. 92–2780, 1993 WL 786964 (D.D.C. Sept. 2, 1993), Judge Hogan upheld an agency decision regarding FOIA exemption four that information supplied to the agency for a government contract was not voluntary. In *Chemical Waste Management, Inc. v. O'Leary,* No. 94–2230, 1995 WL 115894 (D.D.C. Feb. 28, 1995), Judge Johnson also upheld an agency decision that unit price information in a government subcontract was not voluntary. Thus, the court finds that the administrative record in this case supports the agency's decision on voluntariness.

■ Having sustained the agency's determination on voluntariness, the court must next review NASA's application of the *National Parks* standard to the administrative record. Under *National Parks,* financial or commercial information required by the Government is confidential if its disclosure is likely to (1) impair the Government's ability to obtain necessary information in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *National Parks,* 498 F.2d at 770. It is evident that the information at issue here is "commercial or financial" in nature. Similarly, there is no suggestion that the government will be impaired in its ability to obtain this information in the future. Therefore, the only issue is whether the release of the information in question is likely to cause substantial competitive harm to MDA.

■ MDA argues that it submitted affidavits to NASA which "establish the requisite possibility of 'competitive injury' that [MDA] confronts in the satellite launch industry."[8] First, the plaintiff misconstrues the standard: The party desiring nondisclosure has the burden to establish the *likelihood* of substantial competitive injury, not to establish merely a *possibility* of such injury. *National Parks,* 498 F.2d at 770. Second, the affidavit of Roger Dunteman (Director of Business Management in the Space Transportation Division of MDA), on which the plaintiff primarily relies to show a likelihood

of substantial competitive injury, contains nothing more than bare conclusory assertions.

■ Mr. Dunteman's affidavit consists of only generalized assertions that "price will continue to constitute a substantial factor in virtually all future launch competitions," and "competitors will use this information to underbid [McDonnell Douglas]." In this circuit, however, "[c]onclusory and generalized allegations of substantial and competitive harm ... are unacceptable" as a means of sustaining the burden of nondisclosure under the FOIA. *Public Citizen Health Research Group v. F.D.A.,* 704 F.2d 1280, 1291 (D.C.Cir.1983). Additionally, in *Lykes Bros.,* the court noted that plaintiffs in a "reverse-FOIA" action "are required to make assertions with some level of detail as to the likelihood and the specific nature of the competitive harm they predict." *Lykes Bros.,* slip op. at 13.

Mr. Dunteman's statement represents the exact type of "generalized allegations" that fail to show a "level of detail" or a likelihood "of the competitive harm they predict." Nowhere in the record did plaintiff offer any explanation as to how a competitor might use or deduce in any way information that would result in substantial competitive harm to McDonnell Douglas.

The record in this case is vastly different from that in *McDonnell I.* In that case, the MDA showed three different ways a competitor could use the CLINs at issue to cause competitive injury, and NASA had no evidence to refute the calculations except conclusory assertions from its employees. In the present dispute, the plaintiff failed to show with any particularity how a competitor could use the information at issue to cause competitive injury.

Based on the administrative record in this case, the court finds no reason to upset NASA's decision to release the termination schedule percentages and secondary payload prices from the Delta II contract.

### D. Fairness of Administrative Process

In a last ditch effort to prevent the information at issue from being released, MDA

---

8. Memorandum Of Points And Authorities In Opposition To NASA's Motion For Summary Judgment And In Support Of Plaintiff's Cross–Motion For Summary Judgment at 26.

attacks NASA's administrative process as unfair and defective. The charges include imposing an enormous burden on MDA to justify nondisclosure, not waiting for the orderly resolution of pertinent legal issues, and not being permitted to review and refute NASA's decision to release the information at issue. Plaintiff also accuses NASA of chilling MDA's ability to justify nondisclosure of the information at issue by threatening release of any comments submitted by MDA. However, no violations of the FOIA, the APA, or the NASA regulations are alleged.

■ Contrary to plaintiff's claims, NASA's administrative process was more than fair. The plaintiff's burden to justify nondisclosure is established by FOIA, not NASA. *Public Citizen Health Research Group*, 704 F.2d at 1291. Neither FOIA nor the governing Executive Order require an agency to provide a submitter of information with multiple opportunities to comment on the release of information. *See* Executive Order No. 12600; 3 C.F.R. § 235 (1988). Furthermore, although NASA regulations require comments regarding nondisclosure to be made within ten days of notice of a FOIA request, NASA granted MDA repeated extensions to submit comments opposing release of the information at issue. 14 C.F.R. § 1206.610(d) (1994).

Plaintiff's argument that NASA threatened to disclose MDA's competitive injury justifications is an inaccurate characterization of NASA's actions. NASA cannot hold comments or any agency records exempt from disclosure under FOIA without justification. However, NASA explained to MDA that any comments submitted to justify nondisclosure would receive the same review for confidentiality as any other agency record.

■ To support its argument that NASA unfairly threatened MDA into not submitting comments, MDA cites a statement from the

court in *Occidental Petroleum* that such a threat "was one of the factors that combined to produce an unreviewable record." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 345 (D.C.Cir.1989). But the court in *Occidental Petroleum* was specifically referring to the "SEC's practice of releasing substantiation materials submitted in support of confidential treatment while the proceedings with regard to the underlying documents are still pending." *Occidental Petroleum*, 873 F.2d at 344–45. In *Occidental Petroleum*, the SEC policy at issue was to release without review information submitted to prove confidentiality. NASA follows no such policy. To the contrary, the record shows that NASA made clear to MDA that the FOIA exemptions apply to all agency records, including responses to justify nondisclosure of information.[9]

■ Plaintiff also claims that NASA repeatedly denied MDA due process of law, citing numerous instances in which MDA was allegedly denied a meaningful opportunity to be heard on the issue of releasability of information. NASA's alleged denials of due process include prematurely declaring the administrative process closed, declining to disclose evidence it relied on to reach its decision on releasability, and imposing unreasonable time deadlines on MDA.

The case law cited by MDA does not support its due process arguments. MDA again cites *Occidental Petroleum*, where the court upheld a remand to the SEC because the agency "ruled on a ground of which Occidental had no prior notice and to which it had no opportunity to respond." *Id.* at 342. But the problem in *Occidental Petroleum* was that "[t]he FOIA office gave no reasons for its initial denial of confidential treatment" and that legally relevant issues were "apparently brought to [the submitters'] attention for the first time when the General Counsel issued his final decision." *Id.* Whereas in *Occidental Petroleum* the submitter of information was not aware of the issues relevant to release, in the present case, MDA knew it

---

9. MDA correctly states that *Critical Mass* provides the applicable standard for review of voluntarily submitted comments opposing release of information. Although in processing the FOIA request at issue NASA incorrectly claimed that *National Parks* controlled for purposes of deter-

mining the confidentiality of these comments, this error does not justify MDA's failure to submit comments to show likelihood of competitive injury. Such mistakes are why we have judicial review under the APA. 5 U.S.C. § 706(2)(A).

had to justify exclusion by showing competitive harm but failed to meet the burden.

In this case NASA met its duty to provide a brief explanation to support its decision, based on a consideration of the relevant factors in the record. Plaintiff was not denied due process of law just because NASA regulations do not allow cumulative opportunities to submit justifications and to refute agency decisions. In fact, NASA was generous to MDA in extending the time normally allowed to submit comments, thereby giving MDA more process than it had reason to expect, not less.

III. Conclusion

For the reasons set forth herein, defendant's motion for summary judgment concerning disclosure of the disputed information will be granted. Plaintiff's cross motion for summary judgment will be denied, and plaintiff's motion for leave to file a supplement to the administrative record will be granted to the extent set forth herein. The injunction issued in *McDonnell I* will remain in effect.